UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SORRELL HOMES, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLASS R. STILES CO. LLC AND DOUGLASS R. STILES, <br><br> Defendants. | Civil Action No. |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

### Introduction and Summary.

This is an architectural copyright infringement action in which plaintiff, Sorrell Homes, Inc. ("Sorrell Homes"), is seeking damages and injunctive relief arising out of the improper and unauthorized copying of protected architectural work by defendants Douglass R. Stiles Co. LLC ("Stiles LLC") and Douglass R. Stiles. Sorrell Homes asks that this Court enter a preliminary injunction enjoining the defendants from continuing construction on a residence being built by the defendants that is an unauthorized copy of architectural work copyrighted by Sorrell Homes (the "Infringing House") and from marketing or selling the Infringing House unless and until the parties agree on the terms of a license authorizing the use of Sorrell Homes' copyrighted architectural work for the project. Sorrell Homes also requests, as alternative relief in the event sale of the Infringing House is not enjoined, that the Court (i) enjoin defendants from disbursing any proceeds from the sale of the Infringing House without Court approval, and (ii) require defendants to deposit with the Court all remaining proceeds from the sale of the Infringing House pending the outcome of this matter.

The infringement in this case is particularly egregious because defendants knowingly copied and used the copyrighted architectural work in question that previously had been made available to Mr. Stiles in 1998 for use pursuant to a written single-use license, and did so only after Mr. Stiles attempted to license a Sorrell Homes design for a second project and the parties were not able to reach agreement on the financial terms of a license.

In February 1998, Mr. Stiles, a real estate developer then associated with Longfellow Construction Corp., entered into a written agreement with Sorrell Homes that allowed the use of a copyrighted New England Gambrel home design owned by Sorrell Homes for the construction of a residence in Wayland, Massachusetts (the "Wayland Project"). The written agreement provided for the one-time use of the New England Gambrel design for the Wayland Project and expressly stated that any additional use of the design was not permitted unless specifically agreed to in writing by Sorrell Homes. Subsequently, Mr. Stiles inquired about using a Sorrell Homes design for another project. Sorrell Homes was not, however, willing to issue a second license on the same financial terms as the first license and the parties were not able to reach agreement on the terms of a new license to use a Sorrell Homes design.

In or about December of 2002, Sorrell Homes discovered that a home was being constructed on Ridgeway Road in Wellesley, Massachusetts (the "Infringing House") that was an obvious copy of the New England Gambrel design copyrighted by Sorrell Homes. The building permit application revealed that the property was owned by Douglass R. Stiles Co., LLC and that Douglass R. Stiles was the listed builder for the project. The design drawings filed with the Town of Wellesley (the "Ridgeway Drawings"), which indicated that they were prepared by Sean T. Stewart Architects, Inc., are identical to the copyrighted New England Gambrel design drawings Sorrell Homes previously prepared and licensed to Mr. Stiles except for a few,

insignificant details. Sean T. Stewart has acknowledged that he copied the copyrighted Sorrell Homes New England Gambrel drawings licensed for use on the Wayland Project and has explained that he did so only because Mr. Stiles falsely represented to him that he had the right to reuse the Wayland project plans.

The issuance of injunctive relief requested is appropriate here because, in light of the obvious and intentional copyright infringement, Sorrell Homes has a substantial likelihood of success on the merits of its copyright infringement claim and because irreparable injury is presumed as a matter of law in the case of copyright infringement. As evidentiary support for its motion for preliminary injunction, Sorrell Homes relies on the accompanying affidavit of Timothy A. Sorrell.[1]

### Factual Background.

#### *The Business of Sorrell Homes*

Sorrell Homes is in the business of designing quality residential homes, additions, and renovations and licensing its copyrighted designs (Sorrell Aff. at ¶2). Typically, Sorrell Homes licenses the one-time right to use its copyrighted designs in exchange for an agreed-upon fee (Sorrell Aff. at ¶3). The one-time nature of the license to use its house designs is critical to the financial success of Sorrell Homes' business because a substantial amount of time is invested in each design and it is only with the repeated licensing of the designs or elements of the design that the design process can be profitable (*Id.*). Sorrell Homes therefore always retains ownership of all rights in the designs and explicitly states in its written licensing agreements that the license is for one project only (*Id.*).

---

[1] Citations in this memorandum to affidavit testimony will be by name and paragraph number, e.g., "Sorrell Aff. at ¶ __."

### *The New England Gambrel Design*

The Sorrell Homes design at issue in this lawsuit is a New England Gambrel design that was first licensed for use in 1993 in connection with a home constructed at Charles River Court, Wellesley, Massachusetts (Sorrell Aff. at ¶4). The 1993 Charles River Court design drawings were the original creation of Timothy Sorrell, the President of Sorrell Homes, and include designations that the architectural work was designed by Timothy Sorrell and copyrighted by Sorrell Homes (*Id.* at ¶4, Exh. A.). The New England Gambrel design next was licensed for use in 1994 in connection with a home constructed at Hewins Farm, Wellesley, Massachusetts and the design drawings for that project again include designations that the architectural work was designed by Timothy Sorrell and copyrighted by Sorrell Homes (*Id.* at ¶5, Exh. B.).

Sorrell Homes later applied for and obtained Certificates of Registration from the U.S. Copyright Office for the original New England Gambrel design used in connection with the Charles River Court project and for two derivative works licensed for subsequent projects (Sorrell Aff. at ¶¶25, 26, Exh. P).

### *The Wayland Project License*

In early 1998, defendant Douglass Stiles approached Mr. Sorrell and expressed an interest in licensing the New England Gambrel design in connection with the construction of a home at 71 Claypit Hill Road, Wayland, Massachusetts (the "Wayland Project") (Sorrell Aff. at ¶6). Subsequently, Mr. Stiles, in his capacity as Assistant Clerk of Longfellow Construction Corp., entered into a written agreement dated February 24, 1998 (the "February 1998 Agreement"), that provided for the one-time use of the New England Gambrel design in connection with the Wayland Project (*Id.* at ¶6, Exh. C.).

4

The February 1998 Agreement specified that the compensation for the one-time license to use the Sorrell Homes New England Gambrel design would be a Design Use Fee of one thousand dollars ($1,000.00), plus hourly fees for additional design and consulting services (Sorrell Aff. at Exh. C.). The February 1998 Agreement expressly provides that Sorrell Homes shall retain sole ownership of the New England Gambrel plans, including all copyrights, and that any additional use of the plans will not be permitted unless specifically agreed to in writing by Sorrell Homes (*Id.*).

In connection with the licensing of the New England Gambrel design for the Wayland Project, Sorrell Homes modified the earlier New England Gambrel design drawings to include a three-car garage and to incorporate a number of relatively minor changes to the plans (Sorrell Aff. at ¶9). The 1998 Wayland Project design drawings include designations that the architectural work was designed by Timothy Sorrell and copyrighted by Sorrell Homes (*Id.* at Exh. D). Sorrell Homes later applied for and received a Certificate of Registration from the U.S. Copyright Office for The Wayland Project architectural design work (*Id.* at ¶25, Exh. P).

### *Mr. Stiles' Interest in a Second License*

In or about April of 1998, Mr. Stiles approached Mr. Sorrell about again using a Sorrell Homes design for another project (Sorrell Aff. at ¶10). Because he felt the fee paid for the Wayland Project design was well below the value of the design, Mr. Sorrell was not interested in licensing a design to Mr. Stiles on the same terms as agreed to for the Wayland Project, but instead insisted on different terms pursuant to which the license fee would be a percentage of the sale price of the completed home (*Id.*). Mr. Stiles and Mr. Sorrell met at Mr. Sorrell's office to discuss a new license, but were not able to reach agreement on the terms of a license that would allow Mr. Stiles to use a Sorrell Homes design for another project (*Id.*).

### *The Unauthorized Use of the New England Gambrel Design*

In or about December of 2002, Mr. Sorrell learned that a home was being constructed on Ridgeway Road in Wellesley, Massachusetts (the "Infringing House") that was an obvious copy of the New England Gambrel design copyrighted by Sorrell Homes. Because Sorrell Homes had not licensed the use of the New England Gambrel design for use in the construction of the Infringing House, Mr. Sorrell went to the Town of Wellesley Building Department to investigate (Sorrell Aff. at ¶11). There Mr. Sorrell obtained from the Town of Wellesley copies of the Application for Building Permit and the Building Permit for construction of the Infringing House (*Id.* at ¶12, 13 Exh. E, F). The permit application, which was dated December 21, 2001, indicates that the 2 Ridgeway Road property in question (the project site subsequently was renumbered as 4 Ridgeway Road) is owned by Douglass R. Stiles Co. LLC and that Douglass R. Stiles is the builder (*Id.* at ¶12, Exh. E). The permit application also lists Douglass R. Stiles as the architect for the project and names Sean Stewart as a contact person (*Id.*). The Building Permit issued for construction of the Infringing House references the renumbered 4 Ridgeway Road address for the project and indicates that Douglass R. Stiles Co., LLC owns the property and that Douglass R. Stiles is the builder and architect for the project (*Id.* at ¶13, Exh. F).

Mr. Sorrell also obtained from the Town of Wellesley copies of the relevant design drawings filed in connection with the construction of the Infringing House that are identical, except for a few insignificant details, to the copyrighted New England Gambrel design drawings previously licensed by Sorrell Homes (Sorrell Aff. at ¶14, Exh. G). The drawings filed with the Town of Wellesley indicate that the architect for the project is Sean T. Stewart Architects, Inc. and that the architectural work was copyrighted by Sean T. Stewart Architects, Inc. (*Id.*).

After discovering the unauthorized use of the copyrighted New England Gambrel design in connection with the construction of the Infringing House, Mr. Sorrell sent letters to both Mr. Stiles and Sean T. Stewart notifying them of the copyright infringement and inviting both to meet with him to resolve the matter (Sorrell Aff. at ¶15, Exh. H).

Upon learning that Sorrell Homes had not given Mr. Stiles permission to use the Wayland Project drawings for the Infringing House, Mr. Stewart apologized in writing to Mr. Sorrell for his use of the drawings and explained that he had relied upon Mr. Stiles' representation that he had permission to reuse the drawings (Sorrell Aff. at ¶16, Exh. I). Mr. Stewart acknowledged that Mr. Stiles gave him copies of the drawings Sorrell Homes prepared for the Wayland Project to be used as the basis for the design of the Infringing House (*Id.*). However, Mr. Stewart arranged for the drawings that were provided to him by Mr. Stiles in paper form to be scanned and converted to CADD drawings so that he would be able to modify the Wayland Project drawings on his computer to produce a new set of drawings for the Infringing House only after he obtained Mr. Stiles' express representation that he had the right to reuse the Wayland Project drawings (*Id.* at ¶16, Exhs. I, J).

Mr. Stewart subsequently entered into an agreement with Sorrell Homes pursuant to which he agreed to delete from his computer all materials relating to the design of the Infringing House, deliver to Mr. Sorrell documents in his possession relating to the Infringing House, and agreed that Sorrell Homes is the sole owner of the design he used in developing plans for the Infringing House (Sorrell Aff. at ¶18, Exh. K). Mr. Stewart also agreed to arrange for the Wellesley Building Department to remove his name, his firm's name, and his copyright notices from the plans on file relating to the Infringing House and to permit Sorrell Homes to add a

7

notice to the plans indicating that Sorrell Homes owns the copyright to the design reflected in the plans (*Id.*).

### *Defendants' Refusal to Stop Infringing Activities.*

Mr. Sorrell learned in 2003 that the Infringing House had been listed for sale at a list price of $2,595,000.00 (Sorrell Aff. at ¶19, Exh. L). On several occasions during 2003, Mr. Sorrell had his counsel notify Mr. Stiles and his counsel in writing that construction of the Infringing House constituted an infringement of Sorrell Homes' architectural works copyrights and demand that further acts of copyright infringement, including further construction and any efforts to market or sell the Infringing House, cease and desist (*Id.* at ¶20). In October 2003, Mr. Sorrell learned that, notwithstanding his demand that Mr. Stiles cease any further efforts to market or sell the Infringing House, the Infringing House again had been listed for sale, this time at a list price of $2,295,000.00 (*Id.* at ¶22, Exh. M). In November 2003, Mr. Sorrell learned that Mr. Stiles' counsel, Thomas C. Grassia, had urged Caroline Stiles of Coldwell Banker Residential Brokerage to continue to market the Infringing House (*Id.* at ¶23, Exh. N). Mr. Sorrell then had his counsel put Ms. Stiles on notice that he had not authorized the marketing or sale of the Infringing House (*Id.* at ¶24, Exh. O).

Mr. Sorrell, through counsel, has made a number of attempts to resolve the copyright infringement issue with Mr. Stiles. Given Mr. Stiles apparent interest in selling the Infringing House, Mr. Sorrell had expected that it would be in everyone's best interest to resolve the issue as quickly as possible so that the Infringing House could be sold. The resolution efforts have, however, been fruitless and Mr. Sorrell has been disappointed in what appears to be the refusal of Mr. Stiles to grasp the seriousness of his conduct (Sorrell Aff. at ¶21).

**Argument.**

I. **THIS COURT SHOULD PRELIMINARILY ENJOIN DEFENDANTS FROM CONTINUING CONSTRUCTION OF THE INFRINGING HOUSE AND FROM SELLING OR ENGAGING IN ANY EFFORTS TO MARKET OR SELL THE INFRINGING HOUSE.**

Following the familiar test established in this circuit to determine whether a moving party is entitled preliminary injunctive relief, "trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir. 1996). "Likelihood of success is the main bearing wall of the four-factor framework." *Id.* at 16. In light of the "character and objectives" of a preliminary injunction proceeding, in which preliminary, as opposed to final, relief is at issue, a Court may consider otherwise inadmissible evidence. *See, Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986) ("[a]ffidavits and other hearsay materials are often received in preliminary injunction proceedings"). *Compare*, Fed. R. Civ. P. 56 (e) (affidavits in support of summary judgment motion must "set forth such facts as would be admissible in evidence").

In the context of a copyright infringement claim, irreparable harm is presumed, and an injunction precluding further acts of infringement deemed to be in the public interest, if likelihood of success on the merits can be demonstrated. *Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 611-612 (1st Cir. 1988). Where a strong likelihood of success on a copyright claim is established, injunctive relief is the appropriate remedy to prevent continued infringement, either by enjoining further efforts to create infringing work, or if the infringing work is complete or substantially complete, by enjoining the sale of the work or

9

ordering substantial changes to the work so that it no longer infringes on the protected design. *See, e.g., The Yankee Candle Co., Inc. v. New England Candle Co., Inc.*, 1997 U.S. Dist. LEXIS 23099, *16-17 (D. Mass. 1997) (construction of further infringing buildings enjoined and defendant ordered to make structural changes to store already completed and being used by defendant) (vacated pursuant to terms of a settlement between the parties, 29 F. Supp.2d 44 D. Mass. 1998)); *Value Group, Inc. v. Mendham Lake Estates, L.P.*, 800 F. Supp. 1228 (D.N.J. 1992)(enjoining completion of construction of infringing house); *Fred Riley Home Bldg. Corp. v. Cosgrove*, 864 F. Supp. 1034, 1046 (D. Kan. 1994) (defendant "enjoined from constructing, reproducing, duplicating, copying, marketing, selling, or displaying any architectural work which is substantially similar to [plaintiff's copyrighted house design]").

As discussed below, Sorrell Homes has a strong likelihood of prevailing on its copyright infringement claim based on the evidence presented and, therefore, an injunction preventing the defendants from engaging in any further acts of infringement would be appropriate.

### A. Sorrell Homes Has Demonstrated A Likelihood Of Success On Its Copyright Infringement Claim.

The evidence presented by Sorrell Homes reveals that defendants knowingly copied protected architectural work and constructed a house using the protected design. That conduct constitutes a clear violation of Sorrell Homes' exclusive statutory right to reproduce the protected design and Sorrell Homes therefore has a strong likelihood of success on its copyright infringement claim.

### 1. The Copyright Act protects house designs from being copied without authorization and provides for injunctive relief to prevent the construction, marketing, or sale of an infringing work.

Federal copyright law, codified at 17 U.S.C. §1, *et seq.* (the "Copyright Act"), protects owners of certain works of authorship from unauthorized copying or reproduction of the works. Copyright protection extends to eight categories of authorship, the last of which, architectural works, was added by the Architectural Works Copyright Protection Act of 1990. 17 U.S.C. §102(a). The Copyright Act defines "architectural work" as follows:

> An "architectural work" is the design of a building as embodied in any tangible medium of expression, including a building, architectural plans, or drawings. The work includes the overall form as well as the arrangement and composition of spaces and elements in the design, but does not include individual standard features.

17 U.S.C. § 101. By broadly defining architectural work to include not only plans, but also buildings constructed using the design, the Copyright Act now makes clear that the ownership right in a design extends to a building constructed using the protected design. *See, e.g., Yankee Candle Co.*, 1997 U.S. Dist. LEXIS 23099 at *12 ("[i]t is plain from this definition that copyright protection extends to architectural blueprints and the building embodying those blueprints"). Thus, the creator of an original house design has an ownership interest in the design whether the design is reproduced in the form of drawings or an actual house.

Although not required to preserve the copyright, inclusion of the well-known "©" copyright symbol, along with the date of publication and name of the copyright owner, precludes the use of an innocent infringement defense in a copyright infringement suit. 17 U.S.C. § 401. *See also, John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 35 (1st Cir. 2003) (noting that notice became optional rather than mandatory in 1989 while the statute continued to provide incentives to provide notice). In this case, Sorrell Homes did affix the

11

appropriate copyright notice to the Wayland Project drawings that were copied without authorization.

The Copyright Act gives the owner of a copyrighted work the exclusive right to reproduce, or authorize the reproduction of, the copyrighted work and the exclusive right to prepare, or authorize the preparation of, derivative works based on the copyrighted work. 17 U.S.C. § 106. In the case of protected architectural drawings, the federal copyright attaches at the moment the drawings are created or, in other words, when they are "first 'fixed' on paper." *John G. Danielson, Inc.*, 322 F.3d at 35 n.4. Anyone who violates the exclusive rights of the copyright owner is an infringer of the copyright and the copyright owner has the right to institute an action for infringement. 17 U.S.C. § 501. The Copyright Act provides for a variety of remedies to address acts of copyright infringement, including (i) an injunction to prevent or restrain infringement (17 U.S.C. § 502); (ii) destruction of unauthorized copies of the protected work (15 U.S.C. § 503(b)); and (iii) actual damages and recovery of the infringer's profits attributable to the infringement (17 U.S.C. § 504(b)).

The owner of copyright in a work may obtain registration of his or her copyright claim with the U.S. Copyright Office, but "[s]uch registration is not a condition of copyright protection." 17 U.S.C. § 408. However, while registration is not needed to establish the statutory rights of a copyright owner, it is a prerequisite to initiating an infringement action. 17 U.S.C. § 411(a). As noted above, Sorrell Homes did register its design with the Copyright Office before commencing this action.

### 2. Plaintiff's evidence demonstrates that Sorrell Homes owns a valid copyright in the design at issue and that defendants engaged in unauthorized copying of the design.

"The plaintiff in a copyright infringement case bears the burden of proving (1) ownership of a valid copyright, and (2) unauthorized copying of constituent elements of the work that are

12

original." *Saenger Org. v. Nationwide Ins. Licensing Assocs.*, 119 F.3d 55, 59 (1st Cir. 1997) (citations and internal quotation omitted). On the facts of this case, that burden is easily satisfied.

### a. *Sorrell Homes owns a valid copyright in the design at issue.*

Ownership of a valid copyright requires two things: (i) the work of authorship must fall within one of the eight categories (which include architectural works) subject to statutory protection, and (ii) the work of authorship must be original. 17 U.S.C. § 102 (a); *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991) ("[t]he *sine qua non* of copyright is originality"). "Original," as the term is used in the copyright context requires only that the author create the work and that the work possess "some minimal degree of creativity." *Feist Publications*, 499 U.S. at 345 ("requisite level of creativity is extremely low" and the "vast majority of works make the grade quite easily").

In this case, there can be no real dispute that Sorrell Homes has a valid copyright in the design at issue. First, the design indisputably meets the statutory definition of "architectural work" --"the design of a building as embodied in any tangible medium of expression." 17 U.S.C. § 102 (a). Second, the design is the original work of Sorrell Homes and clearly includes the minimum level of creativity required to entitle Sorrell Homes to copyright ownership. *See*, Sorrell Aff. at ¶4. Moreover, the design passed copyright muster at the U.S. Copyright Office, which is charged with examining the design and making a determination that the submitted material "constitutes copyrightable subject matter" before issuing a certificate of registration. 17 U.S.C. § 410(a). Registration carries evidentiary weight in an infringement suit; registration constitutes prima facie evidence of the validity of a copyright if done within five years of publication and whatever weight the court in its discretion deems appropriate if registration

follows original publication by more than five years. 17 U.S.C. § 410(c); *Atari Games Corp. v. Oman*, 888 F.2d 878, 881 (D.C. Cir. 1989).[2]

### b. *Defendants copied a design owned by Sorrell Homes.*

In the context of a copyright infringement case, there are two ways to establish copying. The first, direct evidence of copying, is not usually possible, because "the actual act of copying is rarely witnessed or recorded." *Concrete Machinery Co.*, 843 F.2d at 606. In the absence of direct evidence, copying can be established by "showing that the defendant had access to the copyrighted work and that the offending and copyrighted articles are 'substantially similar.'" *Id.* (citation omitted). Substantial similarity is determined using the "ordinary observer test," that is, "whether the accused work is so similar to the plaintiff's work that an ordinarily reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression." *Id.* at 607 (citation omitted). In applying the ordinary observer test, the focus is on the overall similarities, or lack thereof, in the expression of the idea reflected in the copyrighted work rather than on whether there are differences in details. *Id.* at 608. "[I]t is only when the points of dissimilarity not only exceed the points of similarity, but indicate that the remaining points of similarity are (within the context of the plaintiff's work) of minimal importance either quantitatively or qualitatively, that no infringement results." *Id.* (citation and internal quotation omitted).

Here, there is evidence of direct copying. The evidence reveals that Mr. Stiles gave the Wayland Project design drawings to an architect for use in connection with the Infringing House, and that the architect, Sean Stewart, had the drawings scanned to CADD files so that he could

---

[2] In this case the effective date of registration of the copied Wayland Project design (March 28, 2003) followed the first publication date (March 24, 1998) by five years and four days. Sorrell Aff. at Exh. P.

modify them on his own computer. *See* Sorrell Aff. at ¶¶16, 17, Exhs. I, J, K. Indeed, the architect who prepared the plans for the Infringing House, and who was misled by defendants into believing that Sorrell Homes had authorized the use of its copyrighted design, has acknowledged that he used Sorrell Homes' copyrighted design in connection with the Infringing House and agreed that references on the plans filed with the Town of Wellesley for the Infringing House to his copyright ownership should be removed and replaced with designations indicating that copyright ownership in the design belongs to Sorrell Homes. Sorrel Aff. at Exh. K at ¶6, Attachment A.

Even if there were not direct evidence of copying, Sorrell Homes would have little difficulty establishing infringement because the defendants had access to the infringed-upon design and the most cursory comparison of the design drawings at issue would satisfy the ordinary observer test of substantial similarity. Defendants had access to the Wayland Project design drawings because the drawings had been given to Mr. Stiles under the terms of a one-use only license. Sorrell Aff. at ¶¶6, 9, Exh. C. A side-by-side comparison of the Wayland Project design drawings and the Infringing House design drawings reveals the overall design to be the same with only a few details changed. Sorrell Aff. at Exhs. D, G. The overall similarities are not surprising given the contract between defendants and Mr. Stewart that specified that the Wayland Project drawings were "to be used as the basis for the new residence." Sorrell Aff. at Exh. J. Indeed, while a few details such as the design of some of the windows were modified for the Infringing House, the overall dimensions of the Infringing House, and of almost all of the detail specifications from the chimney on down, are identical to the inch to the specifications reflected on the Wayland Project drawings. The substantial similarity between the copyrighted design drawings and the Infringing House cannot seriously be contested.

### c. *Sorrell Homes did not authorize defendants' use of its copyrighted design in connection with the Infringing House.*

The right to reproduce a copyrighted work can be obtained either through a transfer of the copyright or through a non-exclusive license. A transfer of ownership interest in the work must be in writing, while a non-exclusive license may be granted orally or implied from conduct indicating the owner's intent to allow use of the work. *John G. Danielson, Inc.*, 322 F.3d at 40; 17 U.S.C. § 204. The burden of proving the existence of a non-exclusive license rests with the purported licensee and implied licenses are found "only in narrow circumstances." *John G. Danielson, Inc.*, 322 F.3d at 40.

Sorrell Homes did give Mr. Stiles, or at least the company with which he formerly was associated, a license to use the copyrighted design for the Wayland Project. That non-exclusive license, however, was documented in a written license agreement that specified that the right to use the design was granted "on a one-time basis for the construction of a home at 71 Claypit Hill Road, Wayland, MA." Sorrell Aff. at Exh. C. The written agreement left no ambiguity with respect to the limited scope of the license and the need to enter into a new written license in order to re-use the design:

> This Design Use Fee is for your own one-time use of the plans at 71 Claypit Hill Road, Wayland, MA. Sorrell Homes shall retain sole ownership of the plans including all copyrights and all other rights in the plans, and **any additional use of these plans will not be permitted unless specifically agreed to in writing by Sorrell Homes, Inc.**

*Id.* (emphasis added). The terms of the license for the Wayland Project make it virtually impossible for defendants to claim that they had a license to re-use the drawings for a second project. *See, John G. Danielson, Inc.*, 322 F.3d at 41-42 (in light of written license agreement limiting the scope of use without further written authorization, the "evidence strongly suggests that [plaintiff] granted no permission to others to use the plans").

16

Not only was there no additional written license authorizing use of the design in connection with the construction of the Infringing House, the evidence reveals that Mr. Stiles attempted to obtain from Sorrell Homes a second license to use a Sorrell Homes design, but was unable to do so because the parties could not agree on a mutually acceptable use fee. Sorrell Aff. at ¶10. Instead, Mr. Stiles, already in possession of the Wayland Project design drawings and unable to agree on the terms of a second license, apparently decided to re-use the drawings without permission (and without paying any fee).

Because the evidence is overwhelming that defendants engaged in the unauthorized copying of copyrighted architectural work owned by Sorrell Homes, Sorrell Homes has met its burden of demonstrating a likelihood of success on its copyright infringement claim.

### B. Plaintiff Will Suffer Irreparable Harm If The Requested Injunction Is Not Granted That Outweighs Any Harm Granting Injunctive Relief Will Inflict On Defendants.

Because "copyright protects the unique and somewhat intangible interest of creative expression," in a copyright infringement case irreparable harm is presumed if likelihood of success on the copyright claim can be demonstrated. *Concrete Machinery Co.*, 843 F.2d at 611. "There is, therefore, no need actually to prove irreparable harm when seeking an injunction against copyright infringement." *Id.* at 612.

Further, noting the "sometimes questionable relevance of the 'balance of hardships' factor," the First Circuit Court of Appeals has held that the harm balancing part of the test is heavily dependent on, if not entirely consumed by, consideration of the merits of the claim in a copyright infringement case. *Id.* Indeed, the First Circuit has emphasized that it would be unjust to allow a defendant to continue its infringing activities in the face of a meritorious copyright claim simply because its business is based on the infringing activity and would be harmed by injunctive relief. *Id.* (noting that otherwise "the more an enterprise relies on copyright

infringement for survival, the more likely it will be able to defeat the copyright owner's efforts to have that activity immediately halted"). It is only where "the defendant has shown it may suffer significant harm and the plaintiff has made only a marginal showing of likelihood of success" that consideration of the relative hardships will be a significant factor. *Id.* Thus, the extent of the harm to the defendant should be given no weight in a case such as this where the evidence demonstrates a strong likelihood of success on the infringement claim.

### C. The Public Interest Will Not Be Adversely Affected If The Requested Injunction Is Granted.

Just as the irreparable harm component of the preliminary injunction test is presumed satisfied if the moving party can establish a likelihood of success on the merits of a copyright infringement claim, the public interest prong of the test requires little, if any, consideration in a meritorious copyright case. That is because "[s]ince Congress has elected to grant certain exclusive rights to the owner of a copyright, it is virtually axiomatic that the public interest can only be served by upholding copyright protections and, correspondingly, preventing the misappropriation of the skills, creative energies, and resources which are invested in the protected work." *Concrete Machinery Co.*, 843 F.2d at 612 (quoting *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983) (additional citation omitted).

While there does not appear to be any precedent in this circuit for denying injunctive relief in a copyright case on public interest grounds, courts elsewhere have considered hardship to innocent third parties as part of the public interest analysis. For example, in one case, a court emphasized that hardships to the defendants if prevented from completing construction of infringing buildings "however real, merit little consideration," but declined to enjoin completion of construction in light of the interests of innocent third parties, such as senior citizens who had signed leases and expected to occupy the buildings within days. *Balsamo/Olson Group, Inc. v.*

*Bradley Place Limited Partnership*, 966 F. Supp. 757, 764 (C.D. Ill. 1996) (internal quotation and citation omitted). In *Balsamo*, the court concluded that because the plaintiff could recover money damages, and because imposing significant hardships on the non-parties "would be against the public interest," it instead would enjoin defendants from future use of the design and from distributing profits from the infringing buildings. *Id.* at 764-765 (requiring court approval of future financial transactions by defendants and requiring profits to be deposited with the court pending a final decision on the merits). Similarly, in *Mayotte & Assoc. v. MGC Building Co.*, 885 F. Supp. 148 (E.D. Mich. 1994), the court declined to grant injunctive relief with respect to an infringing house already sold and occupied by the buyer but did enjoin the defendant from constructing, selling, or otherwise transferring title to additional infringing houses.

Because, to Sorrell Homes' knowledge, the Infringing House has not yet been sold or occupied, there is no impediment to injunctive relief prohibiting the marketing or sale of the Infringing House even if the scope of the public interest prong of the preliminary injunction analysis is expanded to consider the interests of innocent third parties. If, however, a public interest consideration somehow is brought to the Court's attention by defendants, and the Court declines to enjoin the sale of the Infringing House notwithstanding the merits of the infringement claim, injunctive relief similar to that fashioned by the court in the *Balsamo* case should be ordered in this case in order to protect Sorrell Homes' ability to recover money damages. That relief would (i) enjoin defendants from disbursing any proceeds from the sale of the Infringing House without Court approval, and (ii) require defendants to deposit with the Court pending the outcome of this matter all remaining proceeds from the sale of the Infringing House.

**Conclusion.**

As set forth above, Sorrell Homes has met its burden of establishing that it is likely to succeed on the merits of its copyright infringement claim by presenting evidence showing that defendants knowingly and intentionally used copyrighted architectural work without permission to do so. Indeed, the infringing conduct is particularly egregious in this case because it was done only after Mr. Stiles obtained a license to use the work for one project only and was unable to reach agreement on the terms of a license for use of a Sorrell Homes design for another project. In essence, when Mr. Stiles realized that he would not be able to license Sorrell Homes' work on financially favorable terms he decided to steal it. Because Sorrell Homes is likely to succeed on its claim, any harm to the defendants resulting from the requested injunction should not be given any weight. Sorrell Homes therefore respectfully submits that it is entitled to a preliminary injunction enjoining the defendants from continuing to construct, marketing for sale, or selling the Infringing House. Sorrell Homes also requests, as alternative relief in the event sale of the Infringing House is not enjoined, that the Court (i) enjoin defendants from disbursing any proceeds from the sale of the Infringing House without Court approval, and (ii) require defendants to deposit with the Court pending the outcome of this matter all remaining proceeds from the sale of the Infringing House.

SORRELL HOMES, INC.

By its attorneys,

Joseph F. Hardcastle (BBO# 559479)
Cintra S. Shober (BBO # 560120)
HARDCASTLE & SHOBER
141 Tremont Street, 3rd Floor
Boston, MA 02111
(617) 423-9990

February 6, 2004